## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WILLIAM N. PETERSON, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. CIV-07-317-RAW |
| JOHN GRISHAM, et al., | ) |
| Defendants. | ) |

### Opinion and Order

In *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Okla.1995), Judge Seay of this court issued a detailed order granting (on multiple grounds) the petition for writ of habeas corpus pursuant to §2254 filed by Ronald Keith Williamson, who had been convicted of the murder of Debra Sue Carter and sentenced to death by a state court in Oklahoma. Judge Seay granted the writ four days before Williamson's scheduled execution. On appeal, the United States Court of Appeals for the Tenth Circuit affirmed that decision, although not on all the grounds articulated by Judge Seay. *See Williamson v. Ward,* 110 F.3d 1508 (10th Cir.1997). Ultimately, the charges against Williamson and his codefendant Dennis Fritz[1] were dropped in light of their exoneration by DNA testing[2]. Subsequently, books have been published and speeches/interviews have been given about that death penalty litigation and its aftermath. Those books and those speeches/interviews have in turn given rise to the present lawsuit brought by plaintiffs William Peterson, Gary Rogers and Melvin R. Hett. Finally, the present lawsuit has prompted motions to

---

[1] Fritz had also been convicted and sentenced to life imprisonment.

[2] Glen Gore was later convicted of the murder, but the conviction was reversed and the case remanded for new trial. *See Gore v. State,* 119 P.3d 1268 (Okla.Crim.App.2005).

1

dismiss pursuant to Rule 12(b)(6) F.R.Cv.P. for failure to state a claim by all remaining defendants[3], which are before the court for ruling.

To state a claim, a plaintiff must allege enough factual matter, taken as true, to make his claim for relief plausible on its face. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir.2008). This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged. *Id.* If the complaint is sufficiently devoid of facts necessary to establish liability that it encompasses a wide swath of conduct, much of it innocent, a court must conclude that plaintiffs have not nudged their claims across the line from conceivable to plausible. Technical fact pleading is not required, but the complaint must still provide enough factual allegations for a court to infer potential victory. *Id.* Moreover, courts are not bound to accept as true a legal conclusion couched as a factual allegation. *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). The degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context. *Robbins v. Oklahoma ex rel. Dep't of Human Servs.,* 519 F.3d 1242, 1248 (10th Cir.2008). Thus, this court will proceed to analyze the allegations in their proper context[4]. In the end, however, the court is faced with this basic question: What two words best describe a claim for money damages by government officials against authors and publishers of books describing purported prosecutorial misconduct? Answer: Not plausible.

---

[3]Defendant James C. Riordan was dismissed by stipulation on January 23, 2008. (#74).

[4]The court has permitted plaintiffs to file a second amended complaint in the face of the original motions to dismiss. *See* Order of February 4, 2008 (#83).

**Summary of the Complaint**

The case at bar involves three books that document two murder cases in the small town of Ada, Oklahoma. *Journey Toward Justice* by Dennis Fritz and *The Innocent Man* by John Grisham discuss the 1982 murder of Debra Sue Carter and the subsequent conviction and exoneration of Ron Williamson and Dennis Fritz. *The Dreams of Ada*, by Robert Mayer, explores the investigation and prosecution of Tommy Ward and Karl Fontenot for the 1984 murder of Denice Haraway.[5] Central to all three books is criticism of William Peterson (the Pontotoc County District Attorney), Gary Rogers (an Oklahoma State Bureau of Investigation Agent), and Melvin Hett (an Oklahoma State Bureau of Investigation criminalist) for their official roles in each case.[6]

In their Second Amended Complaint ("Complaint"), the plaintiffs bring four claims: (1) civil conspiracy; (2) defamation; (3) false light publicity; and (4) intentional infliction of emotional distress.

For their first claim, the plaintiffs allege that the defendants conspired to: defame the Plaintiffs; generate publicity placing the plaintiffs in a false light; and/or intentionally inflict severe emotional distress. (Second Amended Complaint, ¶2). More specifically, the defendants "coordinated their efforts to launch a massive joint defamatory attack ... through the use of speeches, interviews and simultaneously publishing three books that were all three strategically

---

[5]The Haraway murder case is also discussed in *The Innocent Man*.

[6]Plaintiff Hett was not involved in the Haraway case and is not mentioned in *The Dreams of Ada*. He also does not assert any claim against Dennis Fritz arising out of statements from *Journey Toward Justice*. He only brings claims in regard to the Debbie Carter case and *The Innocent Man*.

3

released in October of 2006." (*Id*. at ¶ 20). This alleged attack came in three "waves," each wave represented by a different book: (1) *Journey Toward Justice* by Dennis Fritz, published by Seven Locks Press on October 6, 2006; (2) *The Innocent Man* by John Grisham, published by the Doubleday Broadway Publishing Group, an operating division of Random House, Inc., on October 10, 2006; (3) *The Dreams of Ada* by Robert Mayer, originally published in 1987 and re-published by Broadway Books, Inc. on October 24, 2006.

For their remaining claims, the plaintiffs allege that the defendants are jointly and severally liable for defamation, false light publicity, and intentional infliction of emotional distress. The plaintiffs point to seventy-one passages in the three books which are allegedly defamatory, place the plaintiffs in a false light and are extreme and outrageous causing severe emotional distress.

**The Claims**

As stated, the claims asserted by the plaintiffs involve seventy-one statements in three books. Because "[l]anguage out of context may have a different meaning than the same language within the four corners of the [publication]," the statements will be viewed in the context of each book in its entirety when assessing the sufficiency of each claim.[7] *See Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1044 (10th Cir.1990).[8]

---

[7]Justice Holmes remarked: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425 (1918).

[8]Such consideration does not require the conversion of the motions to dismiss into motions for summary judgment. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir.1997).

**Defamation**

In order to establish a libel claim under Oklahoma law, a plaintiff must plead and prove: (1) a false and defamatory statement concerning plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication. *Cardtoons, L.C. v. Major League Baseball Players Ass'n.*, 335 F.3d 1161, 1166 (10th Cir.2003). In Oklahoma[9], libel is defined as "a false or malicious unprivileged publication ... which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation..." Okla. Stat. tit. 12, § 1441.[10] Plaintiffs concede that because there are no special damages, the plaintiffs can only plausibly recover for libel per se. *See* Plaintiffs' Response (#102) at 7.

A statement constitutes libel per se if it is defamatory on its face. *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1044 (10th Cir.1990). It is a question of law for the court to decide if a statement is libelous per se. *Id*. Personal opinion and hyperbole are protected. *Price v. Walters*, 918 P.2d 1370, 1376 (Okla.1996). "Where the tone of a piece is 'pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage,' readers are notified 'to expect speculation and personal judgment.'" *Id* (Citation omitted). Whether a statement is

---

[9]Jurisdiction in this case is asserted based upon diversity of citizenship, and the parties have not disputed application of Oklahoma law.

[10]In the context of a defamation case, the complaint must give sufficient notice of the statements complained of to enable the defendant to mount a defense. See *McGeorge v. Continental Airlines, Inc.*, 871 F.2d 952, 955-56 (10th Cir.1989).

fact or opinion is for the court to determine. *Magnusson v. New York Times Co.*, 98 P.3d 1070, 1076 (Okla.2004). "The court must examine the entire [publication] to determine whether it is libelous per se". *Kleier,* 921 F.2d at 1044 .[11] Even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir.2002).

Absent some false allegation of criminal behavior, criticism of public officials on matters of public concern is absolutely protected. Okla. Stat. tit. 12, §1443.1. Therefore the defendants' statements are not actionable as libel if, reasonably interpreted, they do not falsely impute a criminal act to the plaintiffs. *Hennessee v. Mathis*, 737 P.2d 958, 962 (Okla.Civ.App.1987)[12]. Under Oklahoma law, the statute of limitation to bring a defamation claim is one year. Okla. Stat. tit. 12, § 95(A)(4).[13]

The case presents a special circumstance and a novel question. The public official plaintiffs were involved in the mistaken conviction of two men for murder who then spent eleven years in prison before being exonerated. Now the plaintiffs bring suit against, among others, one

---

[11]See also *Ramsey v. Fox News Network, L.L.C.*, 351 F.Supp.2d 1145,1151 (D.Colo.2005) ("To determine defamation, the Court must view the broadcast as a whole rather than dwell upon specific parts of the broadcast. The Court must give each part its proper weight and the entire broadcast the meaning that people of average intelligence and understanding would give it.")

[12]Plaintiffs concede this point. *See* Plaintiffs' Response (#102) at 8. Nowhere do plaintiffs dispute the applicability of this statute to themselves in the case at bar.

[13]It appears that all claims concerning statements made by Robert Mayer in his book the *Dreams of Ada* originally published in 1987 are time barred as all statements referred to were apparently in the original publication. The court dismisses all claims concerning statements made in this book because the statute of limitations has expired.

6

of the men mistakenly sent to prison, Dennis Fritz, because of alleged reputational and emotional harm suffered as a result of statements made in books and speeches about that wrongful conviction.

Because the Plaintiffs are public officials and the alleged harmful statements concern their official acts, their claims must be viewed in light of the free speech and free press clauses of the state and federal constitution. *See generally Gaylord Entertainment Co. v. Thompson*, 958 P.2d 128 (Okla.1998).

The United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964)[14] recognized that a "rule compelling the critic of official conduct to guarantee the truth of all his factual assertions" or else face costly libel suits, "dampens the vigor and limits the variety of public debate." *Id.* at 279. Even though a critic believes the truth of the criticism (and the criticism may in fact be true), the uncertainty of proving the factual nature of the statements in court and fear of costly litigation may deter pubic discourse on public matters and is "inconsistent with the First and Fourteenth Amendments." *Id.*[15]

Oklahoma's protection of free speech is worded far more broadly than the First Amendment's restriction on governmental interference with speech. *Gaylord Entertainment*, 958

---

[14]As *New York Times v. Sullivan* involved a publication about public officials on matters of public concern as is the case here, "[w]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

[15]Because the mere threat (or actual imposition) of liability may impair the unfettered exercise of free speech, the constitution imposes stringent limitations upon its permissible scope. *Gaylord Entertainment*, 958 P.2d at 140.

P.2d at 138 n. 23.[16] "The State's free-speech-and-press guarantee protects the public by allowing issues to be freely and vigorously discussed." *Id*. at 138 (footnote omitted). "[T]he *mere threat* of unfounded liability would have a 'chilling effect' on the discussion of public issues." *Id*. at 140. (footnote omitted). "*To allow a defamation action to continue once it has been determined that the speech concerned protected political ideas and did not incite lawless action is in itself a violation of the constitution*." *Id*. at 141 (footnote omitted). Speech concerns protected political ideas if it is rationally connected to the "author's quest for a political change" and even though it may be "injurious (or offensive) to the plaintiffs' interests . . . [it] must be more jealously and intensely guarded than any other form of permissible expression." *Id*. at 140-141(footnote omitted). "Moreover, if under the free-speech guarantee 'good motives' and 'justifiable ends' are a defense against criminal libel, they certainly are against civil libel." *Brock v. Thompson*, 948 P.2d 279, 292 (Okla.1997) (footnote omitted).

Free and open political debate is essential to our democracy and the inevitable "erroneous statement" must be protected in order for the first amendment to have the "breathing space. . . to survive." *New York Times Co.*, 376 U.S. at 271-272. Furthermore in the United States (even under the Sedition Act of 1798), truth has always been a defense where defamatory publications

---

[16]The language of the Oklahoma's free speech/free press clause, Art. 2 § 22, Okl. Const., is as follows:

> "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted."

8

are concerned. *Id*. at 273-274. In Oklahoma as in other states, "[i]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Price,* 918 P.2d at 1376 (quoting Restatement (Second) of Torts, § 581A, comment (f)). "It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." *Crittendon v. Combined Communications Corp.*, 714 P.2d 1026, 1029 (Okla.1985).

The court now wishes to discuss two decisions from other circuits that addressed defamation claims in regard to books about litigation. The first is a Ninth Circuit decision involving a book written by a lawyer, Bugliosi, about the successful defense of his client in a federal murder case. *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995). The plaintiff, a defense attorney representing a co-defendant in the murder case who was convicted, sued Bugliosi for defamation and false light based upon statements in the book critical of his performance during the trial. *Id*. at 1149-1150. The district court granted the defendant's summary judgement and the court of appeals affirmed.

Viewing the alleged statements in broad context of the book, the court noted that the "purpose of the book is to offer the personal viewpoint of the author concerning the trials." *Id*. at 1153. "Because the book outlines Bugliosi's own version of what took place, a reader would expect him to set forth his personal theories about the facts of the trials and the conduct of those involved" and that the "critiques of the . . . participants in the two trials . . . generally represent the highly subjective opinions of the author rather than assertions of verifiable facts." *Id*. at 1154. The court also noted that the subject matter of the book (the facts of the case and the outcomes of the two trials) and the sources used are "inherently ambiguous" and subject to a "number of

9

varying rational interpretations" *Id*.

The second is a First Circuit case involving the book *A Civil Action* by Jonathan Harr, an account of the toxic tort litigation based on contaminated well water in Massachusetts. *Riley v. Harr*, 292 F.3d 282 (1st Cir.2002). The plaintiff Riley, a tannery owner allegedly part of the source of the contamination, sued Harr and the publishers for, among others, defamation, false light invasion of privacy, and intentional infliction of emotional distress alleging that twelve statements in the book wrongly described him as a "liar", "perjurer", "killer", "depressive" and a "bully". *Id*. at 288.

In upholding the district court's order granting defendants' motion for summary judgment, citing *Partington* , the court viewed the alleged statements in context of the subject of the book as a whole. *Id*. at 290. Because the book was about a "controversial lawsuit and the disputed events underlying it," the court noted, an author "should not be subject to a defamation action" for "fairly describ[ing] the general events involved and offering his personal perspective about some of [the] ambiguities and disputed facts." *Id*. Otherwise, the threat of defamation suits would have a chilling effect, "discouraging expression of opinion by commentators, experts in a field, figures closely involved in a public controversy, or others whose perspectives might be of interest to the public" and we would be left with "dry, colorless descriptions of facts, bereft of analysis or insight." *Id*. at 290-291.

Here, Dennis Fritz spent eleven years in prison falsely convicted of murder. The tone of his book *Journey Toward Justice* is not surprisingly one of moral outrage regarding the injustice of the system and critical of those involved in his wrongful conviction. The tone of *The Innocent Man*, by John Grisham, is one of righteous indignation toward the unfairness in the criminal

justice system and the death penalty. The tone of *The Dreams of Ada* reflects the writer's belief that the two men convicted in the Haraway case are innocent and their conviction should be overturned.

The plaintiffs allege that the defamatory attacks are motivated by the defendants' desire to "further efforts to abolish the Death Penalty." (Second Amended Complaint, ¶ 32). As evidence of this motive, the defendants point to a statement made in a speech by John Grisham referencing *The Innocent Man*: "my hope for this book is that people read it and realize that this system we have is simply too unfair to continue." *Id*. at ¶ 31.

Publications regarding criminal investigations and prosecutions which are substantially true and rely on the author's theory of the case and include the author's own interpretation of the facts and its application to law and criticism of the public officials involved are squarely within the realm of political speech. Where the genre of a book is criminal justice non-fiction and the author's tone is one of moral outrage and takes a position critical of the public officials involved, the reader is put on notice to expect imaginative expression, rhetorical hyperbole, exaggeration, speculation and personal judgment by the author. In other words, the reasonable reader is notified by the subject, format and tone of the book to expect a substantially true, yet biased account of the situation based on conjecture and passion and anticipate a departure from a dry presentation of the facts, bereft of analysis or insight. In this regard, this court's reasoning is analogous to that in *Rinsley v. Brandt,* 700 F.2d 1304, 1309 (10th Cir.1983)(distinguishing statements of opinion from false statements of fact).

These books concerning our criminal justice system garner the highest federal and state constitutional protection because they are rationally connected to the authors' quest for political

11

change. They are political speech. Moreover, writing a book critical of government officials involved in the wrongful conviction of two men in efforts to abolish the death penalty appear to be "good motives" and "justifiable ends."

Where the justice system so manifestly failed and innocent people were imprisoned for eleven years (one almost put to death), it is necessary to analyze and criticize our judicial system (and the actors involved) so that past mistakes do not become future ones. The wrongful convictions of Ron Williamson and Dennis Fritz must be discussed openly and with great vigor. Similarly, as in the Haraway case, a critic who believes that people are wrongly convicted of murder should be encouraged to speak out on the subject.

In both cases, where life and liberty are at stake, the constitutional commitment to free and open political debate and the chilling effect of litigation decisively outweigh any potential harm caused by caustic statements critical of government officials. Here, the public officials' actions should be critiqued and debated and the mere threat of liability to these critics (the defendants) would most certainly deter future criticism of public officials involved in criminal justice.

Our justice system is not infallible, mistakes are made and it is important that we analyze how and why those mistakes occur. Unfortunately for the public officials involved, criminal justice is not a pleasant business and public criticism, whether warranted or not, is often sharp and painful. Such is a small price to pay in order to protect and preserve the first amendment freedoms of expression. While the plaintiffs in this case may feel the sting of criticism, because of the enormous constitutional obstacle concerning political speech, they do not plausibly assert any statement which entitles them to relief.

The court reached the foregoing conclusion after review of each of the statements alleged. In the case at bar, the court is persuaded it need not address individually each of the seventy-one statements or passages alleged in the Second Amended Complaint. The court will also spare the reader from page after page of boring *repetitive* analysis. The court emphasizes the word repetitive because after viewing each statement there is only one conclusion that can be reached. *None of the statements are actionable as a matter of law.*

The books themselves are substantially true and the statements alleged when read in context are not libel per se. They are either protected opinion not provably true or false or are factual statements that do not denigrate the reputation of the plaintiffs any more than the substantially true portions of the books. The statements alleged also do not reasonably impute crime to the plaintiffs and are therefore constitutionally and statutorily protected political speech and therefore absolutely shielded from liability.

The statements alleged to impute a crime to the plaintiffs, reasonably interpreted in context, do portray the public officials as absolutely certain of Fritz and Williamson's guilt and fully determined to put them in prison. At no point do these statements convey anything but a good faith belief by the public official plaintiffs that Fritz and Williamson were guilty of murder. This in itself is not defamatory. Certainly a reasonable person expects our government to aggressively protect society from violent crime. The plaintiffs, therefore, do not plausibly assert any statement that is actionable and thus their complaint fails to state a claim for relief for defamation.

**Intentional Infliction of Emotional Distress**

The plaintiffs also bring a claim for intentional infliction of emotional distress. They allege that the defendants intended to cause the plaintiffs severe emotional distress through their defamatory statements. Because the statements are constitutionally and statutorily protected, the plaintiffs can not plausibly assert a right to relief. Also there are two independent grounds for dismissal of this claim: (1) the alleged conduct is not sufficiently extreme and outrageous, and (2) the plaintiffs do not plausibly allege severe emotional distress. Therefore, the intentional infliction of emotional distress claim cannot stand.

In order to recover for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Estate of Trentadue v. United States,* 397 F.3d 840, 855-56 (10th Cir.2005). To insure that only valid claims reach a jury, the trial court must initially act as a gatekeeper to determine if an alleged tortfeasor's conduct is sufficiently extreme and outrageous. *See id.* at 856 n.7.

The conduct complained of here is not extreme and outrageous for two reasons: (1) the statements are not defamatory because they are constitutionally and statutorily protected and; (2) the alleged conduct is not atrocious and utterly intolerable in a civilized society. Therefore it is not plausible that these statements about public officials concerning matters of public concern even comes close to extreme and outrageous conduct.

Assuming arguendo that these statements are not protected, it is not plausible that the conduct alleged here, viewed in a light most favorable to the plaintiffs, is sufficiently extreme

and outrageous. The statements in the context of the books as a whole portray the plaintiffs as the overzealous "bad guys" who used aggressive tactics in the prosecution of the Carter and Haraway cases. The plaintiffs each played a prominent role in the investigation, trial and conviction of these cases.[17] The statements alleged do make reference to aggressive and unfair tactics in the investigation and prosecution; however, taking into consideration the context in which the statements were made, a reasonable person would not find the statements outrageous.[18]

Dennis Fritz spent eleven years in prison wrongly convicted of murder. His written statements of personal animosity about the public officials who played a prominent role in his conviction fall well short of conduct necessary to support a claim for intentional infliction of emotional distress. A reasonable person, in light of such a unique and terrible situation as a wrongful conviction, would expect sharp criticism directed at the state actors on behalf of the innocent man.

The plaintiffs also do not present enough facts to plausibly allege severe emotional distress. The complaint only contains the label "severe emotional distress" with nothing more. This bare assertion without more is not sufficient.

---

[17]Hett was involved only in the Carter case.

[18]In federal cases considering Intentional Infliction claims against media publications brought by undercover officers, the publication of the officers identity is not considered extreme and outrageous even though officers may be put at risk by such publications. *See e.g. Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1223-1224 (10th Cir. 2007) (Broadcast of identity of undercover police officer not extreme and outrageous even if publisher aware that publication could result in 3rd parties making threats to those identified.); *Ross v. Burns*, 612 F.2d 271, 272 (6th Cir. 1980) (Published photographs of undercover officer with caption "Know Your Enemies" and article "decrying the activities of undercover narcs" not extreme and outrageous.").

**False Light Invasion of Privacy**

The plaintiffs also bring a false light invasion of privacy claim. However this claim fails because the conduct alleged is constitutionally and statutorily protected and is not extreme and outrageous.

False light invasion of privacy requires the plaintiff to plead and prove: (1) the defendants gave publicity to a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person under the circumstances, and (3) the defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *Hussain v. Palmer Communications, Inc.,* 2003 WL 1558296 (10th Cir.); *Colbert v. World Pub. Co.*, 747 P.2d 286, 290 (Okla. 1987).

As discussed above regarding intentional infliction of emotional distress, there is nothing plausible alleged which rises to the level of extreme and outrageous conduct that is highly offensive to a reasonable person. Because the alleged defamatory statements are constitutionally protected, it appears this claim would fail on this ground as well. Plaintiffs contend that 12 O.S. §1443.1 does not apply to a false light claim. As defendants note, such authority as exists is to the contrary. *See Johnson v. KFOR-TV*, 6 P.3d 1067 (Okla.Ct.App.2000).

**Civil Conspiracy**

The plaintiffs finally bring a civil conspiracy claim alleging that the defendants conspired to intentionally defame the plaintiffs. The plaintiffs allege that this conspiracy was motivated, among other reasons, by the defendants' desire to "further efforts to abolish the Death Penalty"

16

and to boost sales of their book through publicity through this pending litigation. (Second Amended Complaint, ¶¶ 32, 35).

A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. Civil conspiracy itself does not create liability. To be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means. A conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil conspiracy claim. *Roberson v. PaineWebber, Inc.,* 998 P.2d 193, 201 (Okla.Ct.App.1999). Disconnected circumstances, any of which, or all of which, are just as consistent with lawful purposes as with unlawful purposes, are insufficient to establish a conspiracy. *Dill v. Rader,* 583 P.2d 496, 499 (Okla.1978).

The court finds this claim fails on two grounds: (1) Insufficient factual information exists in the complaint to plausibly suggest an agreement was made and; (2) because the defamation, false light and intentional infliction claims also fail, no plausible unlawful activity exists.

The Supreme Court's decision in *Bell Atlantic Corp. v. Twombly* regarding a Sherman Act antitrust conspiracy claim seems analogous to the civil conspiracy claim in this case. 127 S.Ct. 1955 (2007). In upholding the district court's decision granting Bell Atlantic's 12(b)(6) motion to dismiss, the court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an *agreement was made*." *Id*. at 1965 (emphasis added). The court added that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. *Id*. at 1966. Allegations "must be placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that could just as well be independent action." *Id*. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory... [and] stops short of the line between possibility and plausibility." *Id*.

In this case, the Plaintiffs allege that the Defendants' parallel conduct in publishing (and republishing) and endorsing the three books is evidence of an agreement.[19] However this appears to be nothing more than an allegation of independent action by the defendants. There is nothing alleged that points to a preceding agreement by the defendants to write and publish these books. The defendants' parallel commercial efforts to release books concerning a common theme stops well short of the line between possibility and plausibility. The plaintiffs, therefore, fail to sufficiently allege enough facts to plausibly assert that an agreement was made or that there was any unlawful activity.

Also before the court is the motion of the plaintiffs to amend and supplement the second amended complaint. Defendants object, asserting futility of amendment, which is one approved ground for denying leave to amend. *See Duncan v. Manager, Dep't of Safety, City & County of Denver,* 397 F.3d 1300, 1315 (10th Cir.2005). A proposed amendment is futile if the complaint,

---

[19]The jacket of *The Journey Toward Justice*, written by Fritz, contains quotes from Scheck and the endorsement of Grisham stating the book is "Compelling and Fascinating." The foreword and afterword written by Scheck references his own book *Actual Innocence* and Mayers book *The Dreams of Ada*. The preface written by Fritz states "My deepest gratitude to John Grisham for his friendship, inspiration and encouragement to write my story." Grisham expresses thanks to Fritz in the author's note of his book *The Innocent Man*, "Dennis Fritz revisited his painful history with remarkable enthusiasm and answered all my questions."Grisham endorsed the Mayer's book, *The Dreams of Ada* as "A riveting true story of a brutal murder in a small town and the tragic errors made in the pursuit of justice." (Second Amended Complaint ¶¶ 22, 23).

as amended, would be subject to dismissal. *Watson ex rel. Watson v. Beckel,* 242 F.3d 1237, 1239-40 (10th Cir.2001). The court is persuaded such is the situation here. The affidavit attached to the motion indicates that defendant Barry Scheck, while engaged in litigation, sought opinions from more than one expert (i.e., evidently seeking the opinion most favorable to his case). This is no big deal. It certainly does not demonstrate wrongdoing or conspiratorial conduct. Indeed, it seems to be run-of-the-mill litigation tactics. In short, the court is hardly "shocked, shocked to discover gambling going on here."[20]

Defendants' motions to dismiss (##45-48 & 66) are hereby GRANTED.

The motion of the plaintiffs to amend and supplement second amended complaint (#109) is hereby DENIED.

To ensure compliance with *Warren v. American Bankers Ins.,* 507 F.3d 1239 (10th Cir.2007), a separate judgment will be entered as well.

IT IS SO ORDERED this 17th day of September, 2008.

**Dated this 17th Day of September 2008.**

J4h4i0

Ronald A. White
United States District Judge
Eastern District of Oklahoma

---

[20]http://www.youtube.com/watch?v=nM_A4Skusro